This court for this session now resolves. Be seated. Alright, thank you everyone for your patience. We hopefully have all technical glitches resolved. The next case on calendar for argument is United States v. Barrogo. Counsel for appellant, please proceed. Thank you, Your Honor. Can you see me okay now? Yes, you're there. Thank you. Okay, Catherine Young from the Federal Public Defender's Office. I would like to reserve three minutes of my time for rebuttal and I will watch the clock. Alright, thank you. I'm representing appellant Marites Barrogo who is appealing her sentence and the amount of restitution awarded against her following her conviction for using SNAP benefits without authorization. Ms. Barrogo owned a restaurant. She was not entitled to SNAP benefits. She entered into an agreement with her co-defendant that Barrogo would pay her co-defendant, Muna, $400 and Muna would give Barrogo her SNAP card and PIN and Barrogo would purchase $600 of food for her restaurant. Now the total benefits that Barrogo and Muna trafficked were recouped from Muna. So restitution was not an issue for most of the litigation. The government took the position that Barrogo should pay half the amount of restitution even though she had in fact paid, reimbursed Muna for two-thirds of the restitution. Barrogo agreed that she would pay half of the amount that she purchased from Muna, which was $15,000. The day before the restitution hearing, the government for the first time sought an additional $21,000 from other parties, JD and AM, and that's what's in dispute in this litigation. That amount of benefits and the basis of the calculation of those benefits varied from $5,000 to $21,000 over the few months of the proceedings. And it all started in the PSR. The PSR said that in December 2019 they saw photos of men delivering carrots to Ms. Barrogo's restaurant. So they went back and looked at all the register receipts from two stores for those people's purchases and they calculated in the PSR all the register receipts from those two stores from 2019 and 2018. No further investigation was done at that time. The next month, the supervisor of the public welfare investigator overseeing the investigation of the Investigation and Recovery Office testified that she was involved in the investigation. She confirmed the loss amount with Muna was $15,000, and with the others, the JD and AM chunk was $5,000. She said not the total of the $21,000 that was set forth in the PSR as being suspected, all purchases at two stores. She said that based upon their investigation, only $5,000 of that was trafficked with Barrogo. She said that $20,000 was a fair assessment of the total amount from Muna and JD and AM. So they had done an investigation. There were a lot of different proceedings here, but eventually it culminated in testimony by—I'm not sure I'll pronounce his name correctly— but Mr. Caradang about the receipts. The receipts were for bulk purchases. The defendant had acknowledged that she had trafficked and snapped benefits with these two people, JD and AM. And so it was a matter of calculating it up, and they went through the receipts, and they saw that these are items that are not typical for household use because they're high-volume food items that were consistent with use in a restaurant. And there's other evidence like the videos and the photographs that add some more credence to that. So when you add that all together, I guess the question is where's the error, and particularly given the relatively deferential standard of review for this kind of determination by a district judge? Absolutely, Your Honor, because the first point you were making was that they had gone through the receipts, and that's exactly what didn't happen. That's what Caradang testified to. But the reason I'm going back to the beginning is to point out that his testimony was baseless, that he didn't in fact do what he said he was doing, and that his testimony was contradicted not only by his own supervisor's previous testimony, but also by the PSR and also by his own testimony in other respects. He was contradicting everything. And the reason I went back to the beginning was to point out that when you get to his testimony, he says, well, I've gone through the receipts, but he didn't, because the PSR tells us that the exact amount that Caradang found was the total amount at two different stores. Nobody went through the receipts and tallied them at that point. The total amount at two stores is what the PSR said. And then Ms. Borja testified that we've done an investigation. We've narrowed it down to 5,000. The government then brings in Caradang, doesn't bring in Borja, doesn't mention Borja. Caradang says, I've gone through the receipts, and I've arrived at the same amount that was the total amount of purchase at two stores. So he couldn't have done that. And we know that by other aspects of his testimony. When he says that, for example, he said, first of all, it's the total amount at two stores, at one store, maybe more stores, other stores, big stores, too. He's all over the place. But the important thing is that he's arriving at the exact same amount that PSR says is, we haven't done our investigation yet. These are suspected amounts because they're the total purchases at two stores. Caradang then takes a stand and said, well, it's one store, it's two stores, it's more stores, it's big stores, but I've gone through all the receipts. But he couldn't have because the amount he's relying on is the amount that PSR tells us is the very beginning amount of total purchases at two stores. And there are other respects in which Caradang's testimony demonstrates that it can't be credible. First of all, he says, I'm sorry. I don't want to cut you off, but I did, just with your limited time, I did want to hear from you on the authentication feature issue and why you believe that enhancement wasn't proper. So I'd welcome you to finish your comments on the restitution, but I just wanted you to know I'd like to hear your views on that other issue, too. Absolutely, Your Honor. Since Ms. Barroga has been released, the restitution issue is the most important issue to her now. I did want to just close out, and I will get to the authentication feature, but I just wanted to point out, as it's discussed in the brief, Caradang's testimony is not only internally contradictory. He says things that are all over the map. It also contradicts his own supervisor's testimony and the PSR. But let me turn to the issue that Your Honor wanted me to reach, and that's the authentication feature enhancement. And in this case, it's important to note that Muna gave Barroga her EBT card. She gave Barroga the pins. There's no issue of – it's a genuine EBT card and a genuine pin. No issue of fake IDs. And the government tells us that to interpret statutory language, we look at the language itself, we look at the specific context of the language, and we look at the broader context of the statute as a whole. So if we look at that enhancement, which is 2B1.1B11, subparagraph A analogizes or equivalences the possession or use of a device-making equipment or an authentication feature. In other words, they're saying it's the same thing to have device-making equipment or an authentication feature. And the whole paragraph is talking about the production or trafficking of false IDs. It's talking about the possession of five or more false IDs, the unauthorized transfer using false IDs to make other false IDs, production of trafficking. None of it's all false IDs in production of trafficking they're in. In this case, we have a genuine pin and a genuine EBT card used with Muna's authorization. Obviously used illegally, but with the authorization of the holder. There's nothing fake about the IDs or the pins in this case. So that's why we have trouble applying and why we argue that the enhancement simply doesn't apply to this case. Now, under the terms of the language, the enhancement applies only when an authentication feature is used on an identification document, document-making implement, or means of identification, to determine whether the document is authentic or falsified. And in this case, the pin wasn't on the document and it wasn't used to make sure the EBT card was genuine. So it wasn't used as an anti-counterfeiting measure on a physical identification document. And that, because of the language of the statute or the guideline, the focus of the guideline and the facts of this case were arguing it simply doesn't apply. And I see that my time is low, so are there any other questions that I can address on these issues? Counsel, this is Judge Herter. Can I just ask you briefly, what precisely is the relief that you're asking for? Well, we'd like it to be reversed for reconsideration of the restitution. That's the main thing. We think that the district court's restitution finding was clearly erroneous. We also think that the enhancement should be reversed, but at this point it's moot since she's already served her sentence. But the restitution is the main issue that she would like reconsidered. Okay. Thank you. Thank you, Your Honor. Thank you, Counsel. We'll hear from the government. Good morning again, Your Honor. Ben Petersburg for the United States. May it please the Court. There are three issues raised on appeal, and we would ask the Court to affirm on all three. The first issue is that the government did breach the plea agreement below when it asked for two years of supervised release, when the plea agreement itself, in the plea agreement, the government promised to recommend one year. But we would argue that the appellant has still failed to show a reasonable probability that that breach affected the outcome of the sentencing. Second, as to the authentication feature, we argue that there's no plain error. And third, that the restitution order was supported by sufficient evidence and related factual findings were not clearly erroneous. You know, the first issue was not addressed during the initial argument, but I think it is important and that's where I wanted to start. We do concede that there was error there, and unfortunately that error was mine. I was counseled below. I made an inadvertent and sort of careless mistake. I was very careful when I recommended a sentence of imprisonment at the low end of the guidelines. I was not as careful when I recommended two years of supervised release instead of one. That said, there was no objection below, so we were not in automatic reversal territory. The defendant or the appellant does still need to show a reasonable probability that that breach affected the outcome of the proceedings. When we look at that recommendation in context, I think it shows that there was plenty of support for the court's decision, ultimately, to impose three years of supervised release. The government asked for two years in a written sentencing memorandum. That was filed on May 28th of 2021. The U.S. Probation Office also asked for two years of supervised release in its written recommendation, which was filed two days prior to that, May 26th, 2021. At the sentencing hearing itself, the government repeated its recommendation. Probation asked for one year of supervised release. The defendant asked for three years of probation initially and then a split sentence. After two sentencing hearings, briefing and argument on sentences imposed on similarly situated defendants, the defendant's elocution and the court's thoughtful consideration of the aggravating factors supporting her sentence, which were, she really went into great detail in ER 93 to 96, taking particular issue with the defendant's conduct and her continued unlawful behavior engaging in this snap trafficking, even after she was approached by public health investigators in the case. The court actually called her a scofflaw in the sentencing transcript. So there's plenty of basis to support the ultimate imposition of three years of supervised release. And under these facts, we can submit that, you know, we can only speculate whether the court would have imposed a lesser term had the government actually recommended one year. And so we would ask the court to affirm on that issue. Of course, if the court disagrees and finds error that is sufficient to vacate the sentence, it can still, does still have the discretion to consider the remaining issues on appeal. And the second issue that I'd like to address is the authentication feature. And I do want to note for the record that the appellant, they did not object to the application of this enhancement in the pre-sentence report. They did not object to the application of the enhancements at sentencing. And in fact, they stipulated and agreed as part of the plea agreement that this application applies to her offense conduct. So based on that stipulation, there was really not a great need for additional evidence or testimony supporting this application, and the relevant portions of the record are somewhat limited. Well, your adversary just said that this is moved because she served the sentence. Are there collateral consequences to the enhancement? Not that I'm aware of. It is an issue that could come up in other cases. So if the court does choose to address this here, I don't believe there's any other cases addressing whether or not a PIN, a personal identification number constitutes an authentication feature. If the issue has been abandoned, well, for us, I suppose, at this juncture. It doesn't make any difference is what I'm hearing. Well, I mean, ultimately if this— You'd like to have a lovely opinion saying that this was fine. It would be useful for us in other cases. It's not going to affect this defendant. Understood, Your Honor. If the court has questions on that particular issue, I'd be happy to address them. Otherwise, I'll move on to restitution. We do submit that the restitution order was supported by sufficient evidence and that the court's factual findings below are not clearly erroneous. The district court was familiar with the facts of this case, presided over sentencing hearings and a restitution hearing, and personally observed the testimony of the public health investigator, Ruben Carandang, and found him, quote, very credible when it determined the restitution amount and imposed that restitution order. Despite the claims that there are internal inconsistencies, there are facts in the record that clearly support the court's findings, and those are found in the PSR at CSD 9 that total up— What did Carandang do? He or someone at his direction reviewed various transactions, and did they make any attempt to isolate out particular items that they viewed as likely to be SNAP benefit items that were going to the restaurant? Yes, Your Honor. That's exactly what Mr. Carandang did, and that was his testimony at the restitution. How did he do that? Did he have someone—did he personally do that? Did he have somebody do it on his behalf? He testified that he personally reviewed those receipts, all of the records of the purchases made by the people identified as J.D. and A.M., all the purchases made using their SNAP accounts from 2018 through 2020. Were there items that were charged as SNAP accounts that he, in his judgment, decided those were not likely to go to the restaurant, something that seemed like it was more for personal use? I don't know that he testified to that specifically, but he did say he identified large transactions that were inconsistent with household use and that he looked for items that also coincided with the types of food that was served at this restaurant. He actually, at one point, identified the purchase of a whole pig and was able to link that up with a Facebook post by Ms. Barogo displaying a whole roasted pig. What is this issue with the $5,000? Was that earlier in the proceedings, the reference to that amount? That was earlier. That was at a sentencing hearing, and Bernice Borja, who's actually the supervisor at Public Health, she testified in support of the government's recommendation at that time, which was 10 months imprisonment, and we asked for a $20,000 fine. And so she was testifying for a different purpose. At that point, we had asked for a fine because there were administrative proceedings in effect to recoup some of these SNAP benefits from the beneficiaries themselves, and we were concerned about double recovery. And so a recommendation was made for a $20,000 fine, which we knew was roughly what she would be liable for if there was an order of restitution in her own case. The court declined our invitation to impose a fine and asked us to proceed on the restitution issue, and that's why we had the hearing a few months later. So I don't think there are actually inconsistencies in the amount that we were looking for. We asked for a $20,000 fine as an approximation of restitution, and the actual restitution order was $18,752.30. I hope that answers the question. In sum, the government's brief did point out to specific facts supporting the court's restitution determination. The testimony at the restitution hearing is not inconsistent with the PSR. It was in addition to the information included in the PSR. I don't read that as conflicting in the same way that counsel on the other side did. If you look at CSD 9, paragraph 29, where there's a total amount of the SNAP purchases identified, it actually says it's based on the register receipts obtained from stores. So it's not this sort of arbitrary figure that was sort of referred to in the initial argument. The court below, we think, correctly made this determination based largely on the testimony of Mr. Karendang in the PSR. She found Mr. Karendang very credible, so we would submit that these factual findings are not clearly erroneous and the restitution order should be affirmed. I see I do have just a little bit of time remaining. I'd be happy to answer any additional questions from the court. It appears there are none. Thank you, counsel. Thank you very much. Rebuttal. Thank you, Your Honor. Ms. Young, are you abandoning the authentication feature issue? Is that an issue we need to resolve? Are there some other collateral consequences for your client, as Judge Schroeder was asking? Yes, Your Honor, and I apologize because I may have misspoken. I was focused on restitution, which is obviously the most important thing to my client, but she also was concerned about the supervised release. And that authentication feature issue could have an impact on supervised release because there is, I think, authority that if a defendant overserves her time in custody, the court can consider that and possibly reduce supervised release. And so the supervised release, the extent of supervised release, is obviously something Ms. Barrogo is also concerned about. Have I responded to that question? Well, just to be clear, this was raised as an assignment of error on appeal and the time has been served. And so I think the court, all of us are asking, do we need to resolve this? And it's your client, so what is your view on that? Well, my view is that it could be relevant. If it's found that that enhancement was inappropriate, then her guideline range would be lower. That would mean that on retrial or resentencing, it could be argued that she should be entitled to a lower term of supervision because she had overserved the term of custody. Thank you. That's what I'm arguing. And I also wanted to respond to the government's argument about how the PSR is not inconsistent with Karen Dank's testimony, and it is necessarily inconsistent. If you look at the PSR, what it says is they're talking about the total receipts at two stores. That amount is the total receipts at two stores. Karen Dank then takes the stand and says, that's the amount of receipts that I've gone through, through maybe one, maybe two, maybe many stores, maybe big stores, and I've gone through all these receipts and arrived at exactly the same amount. So they are necessarily inconsistent, and we'd argue that because of all the other flaws with Karen Dank's testimony, it should be rejected. Unless there's any further questions, I see I'm out of time now. Thank you, counsel. Thank you to both counsel. The case is argued and is submitted for decision by the court.
judges: SCHROEDER, RAWLINSON, BRESS